[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case involves a neglect/uncared for petition filed on May 1, CT Page 532 1989 by the Commissioner of the Department of Children and Youth Services (DCYS). The petition was last amended on July 25, 1989 for the purpose of adding the putative father as a respondent. The subject of this petition is Cassandra R., whose date of birth is August 19, 1976.
Service of the petition upon the mother, Pamela R., and the putative father, Thomas Al. was confirmed by the court. Service by publication was made with respect to the legal father, William R. Jr., who was last known to reside in Florida. Neither father was present at the trial and neither was represented by counsel. Mother is and has been Cassandra's sole custodial parent for many years. Mother did not appear at the trial due to her inability to arrange and secure the special transportation which she requires as the result of her disability. She was represented by counsel throughout the trial.
The trial began on July 23, 1990 and was concluded on July 24, 1990. From the evidence produced during the course of the trial, as well as facts contained within the court's file concerning prior proceedings involving Cassandra, of which the court has taken judicial notice, the court finds the following relevant and material facts to have been proven.
ADJUDICATION — as of July 25, 1989 (date of last amendment)
As of and subsequent to August 1988 Joyce Shalkowski, a social worker from the State Department of Human Resources, has been assigned to the case of Cassandra's mother, Pamela. Ms. Shalkowski's function is to provide coordinated health care and homemaker assistance to Pamela, who since August, 1988, has been bedridden in her home suffering from advanced multiply sclerosis. As of and subsequent to August, 1988 Pamela has been able to move her hands, arms and head but not her legs or lower body. As of the date of adjudication she was able to pull herself up by use of a bar hanging over her bed, but could not turn herself over nor get out of the bed without the use of a hoist operated by someone else.
Contrary to the allegations in the neglect petition, some health care services were in fact provided to Pamela during the period of June, 1988 through February, 1989. From August, 1988 through May 25, 1989 the State Department of Human Resources provided health care and home maker services to Pamela through contracted services with private providers. A Health care worker assisted Pamela a couple of mornings each week for three to four hours at a time. However, those services were not consistently provided. Each health care service prouder would only remain from a few weeks to months and then terminate because of Pamela's disagreeable personality and verbal abuse of the workers. The services of at least four and possibly five providers were utilized between August, 1988 and May, 1989. The health care services were completely terminated as of May 25, 1989 as the agency had by then run out of providers who would agree to work CT Page 533 with Pamela. In addition, outside volunteers from Pamela's church, and some of her friends also provided some assistance as observed and testified to by Colleen Durga, a DCYS social worker assigned to Cassandra's case. The Human Services Department continues to provide homemaker but not health care services.
Ms. Shalkowski visited with Pamela in her home on several occasions observing that Pamela was a heavy cigarette smoker. Not only did Pamela smoke in her bed, but there were numerous cigarette burn marks on the bed clothing. The social worker was so concerned about the danger of a fire and the possible resulting danger to Cassandra that she notified DCYS of her concerns early in 1989. Ms. Shalkowski visited with Pamela at least twice since May, 1989, the last time being June, 1990, and found that her physical condition has become worse with an increase in her need for physical care from others.
Colleen Durgo visited the home at least twice per month between February and July, 1989. She also observed Pamela's dangerous smoking habits and her poor physical condition. Being aware of the conditions under which Cassandra was living, Ms. Durga testified that on June 23, 1989 and August 1, 1989 she attempted to enter into service agreements with Pamela in an effort to meet some of Cassandra's needs. Both efforts were rejected by mother.
The court heard direct testimony from Cassandra and finds her testimony to be credible and convincing as to the conditions under which she was required to live for the year prior to the filing of the amended petition on July 25, 1990. From that testimony, together with the testimony of the two social workers, the court finds the following facts, which are relevant and material to the issue of neglect as of the adjudication date, to have been proven.
Over at least the past year the only persons who have stayed in the family residence during the night time hours have been Pamela, Cassandra, and Cassandra's brother, Jason, whose date of birth is March 27, 1973. Since August, 1988 Pamela, who is suffering from multiple sclerosis, has been confined to a hospital bed in her home. She is unable to move her body except for her hands an head. She is unable to get out of bed on her own. She is totally dependent upon others for all of her care and needs. Every night during this entire period since August, 1988, Cassandra has been required to sleep on the floor next to her mother's bed in order to care for mothers personal and physical needs. Cassandra sleeps on foam cushions, and since sheets will not fit over the cushions she put towels over them and sleeps on the towels with a blanket over her. This is in spite of the fact that Cassandra has a room of her own upstairs in the house. Mother would not permit Cassandra to sleep in her own room and on occasions when she wanted to do so mother would have either Jason, or one of the homemaker workers, remove the lightbulbs from the bedroom so that it would be dark, thus discouraging Cassandra from using her own CT Page 534 bedroom. Jason was not required to care for his mother's personal needs.
Specifically, the child was required to change her mother's urine and/or excrement pads or diapers and clean her mother's anal/genital areas. In addition, this 12 year old was required to care for her mother's menstrual discharge and consequent cleaning. Practically every night over this long period of time mother would wake Cassandra at least twice, once usually between 1 and 3 a.m., to care for her personal and physiological needs. On one occasion when Cassandra had friends overnight for a sleep over and was able to sleep outside of her mother's room, her mother called her between four and flue times during the night to care for her needs. All of this in spite of the fact that the child had to get up to go to school on most days. As well can be imagined, it was difficult for the child to get up in time for school on many mornings.
In addition, mother smokes up to two packs of cigarettes per day. Cassandra found often be awakened during the night to deal with one of mother's burning cigarettes which had fallen on the floor or the rug. Numerous burn holes have been observed by several witnesses on mothers bedding and some of her clothing. There appears to be considerable danger of a fire starting in the bedroom as a result of her smoking in bed. On one occasion Cassandra was awakened from a deep sleep to find her pillow on fire. Her mother, being unable to arouse the child, threw lit cigarette to where Cassandra was sleeping. The cigarette landed on her pillow and burned a 3 inch by 3 inch area on the pillow before Cassandra awoke and put out the fire.
Cassandra's brother, Jason, also resided in the home during much of the time prior to July, 1989. Jason was 16 years old at the time the petition was filed. Mother used Jason as the means of physically disciplining Cassandra. Jason would hit and punch Cassandra, sometimes in the presence of their mother who would either tell Cassandra that she deserved it or say to Jason, "I'm not looking, Jason" and allow him to continue to physically abuse Cassandra. Jason was removed from the home by order of the court on June 27, 1989, leaving Cassandra alone in the house to care for and be with her mother. The question becomes which was worse for the child: being alone with her mother without even the minimal contact, communication and help she could hope to received from her brother in the event of an emergency, or having her brother in the house where he would and did physically assault her with her mothers approval.
In addition to caring for her mothers personal and physical needs, Cassandra was required to do most of the shopping and the cooking. The only real help she had was with the cleaning which was done by the homemaker service, when it was available. Cassandra was not permitted to to participate in any social activities, including after school or religious social functions; consequently, she had few friends, CT Page 535 Her entire life revolved around her school work and caring for her mother.
Clinical evaluations were conducted by Dr. David Mantell and Dr. Marilyn Eichler, licensed clinical psychologists, in November and December, 1989. Their reports have been introduced as petitioners exhibits A and B. The conclusions and recommendations of the clinicians, which are in agreement with each other, are that the conditions and circumstances to which Cassandra was subjected while living with her mother were harmful to her well being. Both clinicians recommend her removal from that setting.
Dr. Mantell related during his testimony that he had conducted an unrelated evaluation involving Pamela in 1988 and found her condition to have significantly deteriorated a year later.
Several comments contained in Dr. Eichler's report concerning her interview with the mother and her evaluation of Cassandra are worth repeating by way of emphasis. (See Petitioner's exhibit B)
Pam stated that Cassie is no longer involved in her physical care. In any case she maintained that "Cassie only did things for her that she would have to learn to do for herself such as shave her legs." She denied that Cassie had ever had a major role in caring for her physically.
This reported statement of Pamela is in direct contradiction to Cassandra's testimony, which the court finds credible, concerning the physical care she was required to give to her mother.
Cassie's (sic) is caring for an adult and is, in fact, totally encircled by this charge while none of her own needs are being met. There is no one to supervise her and provide her with the support and nurturance that a growing adolescent requires. She is virtually alone, must take care of all her own needs and has the additional burden of caring for her mother and the household. At the age of 13 1/2 she carries the enormous responsibility for her own welfare as well as her mothers. She is virtually her mother's life-line.
It is not in [Cassandra's] best interest to bear these burdens at such a tender age and to be denied the opportunity to develop into the bright, productive adult that she is capable of becoming.
No twelve year old child should be required to live under conditions such as those which this court finds that Cassandra was living under at the time this petition was filed. This was not simply a situation wherein the child was occasionally helping her mother cope with a difficult physical situation. Every member of a family should be required to help out in times of adversity. What is most disturbing in this situation is that for more than a year Cassandra was her mother's only physical CT Page 536 care giver during the night time hours, and often during the day when health care was not available, She was constantly required to perform personal hygiene for her mother. She was subjected to physical abuse at the hands of her brother with the acquiescence of and at times direct approval of her mother. She was subjected to the constant threat of real physical danger as the result of her mothers smoking habits and her brothers assaultive behavior. She was subjected to being required to sleep on the floor of her mother's room, to be summarily awakened at any time of the night to do her mothers bidding. She was totally subservient to the needs and demands of her mother and was experiencing what Dr. David Mantell described during his testimony as role reversal. Cassandra was becoming the mother and Pamela the infant. Cassandra testified that these conditions which existed prior to July 25, 1989 continued until she left the home on November 20, 1989.
The court finds that the totality of these conditions and circumstances, all of which have been proven by a fair preponderance of the evidence as of the date of the petition, were injurious to the health and well being of this child. Consequently, Cassandra is adjudicated to be a neglected child.
The court finds that the petitioner has not proven by a fair preponderance of the evidence that her home cannot provide the specialized care which her emotional and mental condition requires.[1]
There was no evidence concerning any specialized care that Cassandra required apart from those of any other normal twelve year old girl. (Emphasis added) Therefore, the uncared for portion of the petition is dismissed.
DISPOSITION — as of July 24, 1990 (final date of trial)
After reviewing the mandated social study and an addendum to that study which were prepared for the court by CYS,[2] the court finds the following facts to be relevant to the disposition of this case.
On November 20, 1989 Cassandra was removed from her mother's home by the police on a delinquency complaint by the mother concerning an uncontrollable and violent argument between Cassandra and her brother, Jason, who was home for the Thanksgiving holiday. Cassandra has not returned home as of this date.
For several months subsequent to November 20, 1989 Cassandra lived with her older sister, Robin. However, while that arrangement worked reasonably well, it was terminated due to Robin's circumstances, including her employment as a police officer, which did not permit her to provide the supervision and care which Cassandra requires on a long term basis. Cassandra was then placed for a short time in a children's shelter and is now in a foster home. CT Page 537
The only other changes of significance between the adjudication date of July 25, 1989 and the disposition date of July 24, 1990, is that prior to leaving the house in November, 1989 Cassandra was reported to be sleeping in her mother's room on a folding chair rather than on the cushions. One cannot conclude that this is an improvement in conditions. Additionally, Jason is now residing with his mother on a full time basis. Finally, Pamela's physical condition seems to be getting even worse. Ms. Durga testified that during a recent visit she saw Pamela drop an unlighted cigarette near her head and observed that she was totally unable to retrieve the cigarette herself. She required assistance even for this simple task. Pamela continues to smoke in bed. Cassandra visits with her mother periodically under the supervision of DCYS. The visits have not gone all that well.
Cassandra has done very well academically during her eight month absence from her mother's home. Her grades, which were always very good, have improved and she is enrolled in a program for the gifted. She appeared to the court to be happy with her new foster home and her school and new friends. She stated to the court that not only did she not wish to return to live with her mother, but that she would not do so even if so ordered by the court.
The court finds that the conditions in this home have deteriorated from those which existed as of the date of disposition. Pamela's physical condition is worse and Jason has returned to his mother's home. If Cassandra was to be returned to this home with the conditions and circumstances as bad or worse than they were when the petition was filed she would again be thrust into the same deleterious and stifling environment which resulted in her being found neglected by this court. That clearly is not in her best interest.
Consequently, the court finds that the petitioner has proven by a fair preponderance of the evidence that it is in Cassandra's best interest to be placed in the care and custody of the Commissioner of the Department of Children and Youth Services for a period not to exceed 18 months, and it is so ordered.
Entered at Montville this 27th day of July, 1990.
TERENCE R. SULLIVAN, JUDGE